FILED
2014 May-22  PM 02:55
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT FOR THE
### NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| HB LOGISTICS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION 2:14-cv-00696-JHE |
| | ) | |
| PILOT CORPORATION; and, | ) | |
| PILOT TRAVEL CENTERS, LLC, | ) | JURY TRIAL DEMANDED |
| d/b/a PILOT FLYING J, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

### AMENDED COMPLAINT

COMES NOW the Plaintiff, HB Logistics, LLC, through undersigned counsel and hereby amends its complaint in the above matter to assert the following claims against Pilot Corporation and Pilot Travel Centers, LLC, d/b/a Pilot Flying J (collectively "Pilot"), as follows:

### THE PARTIES

1.      Plaintiff, HB Logistics, LLC, is an Alabama limited liability company with its principle place of business in Jefferson County, Alabama.  On or about December 29, 2009, HB Logistics, LLC, entered an Asset Purchase Agreement regarding certain assets and operations of McGriff Transportation, Inc. and McGriff Logistics, Inc. based in Cullman, Alabama, including all claims against Pilot relating to the discount and rebate fraud alleged herein (collectively "Plaintiff").

2.      Defendant, Pilot Corporation ("Pilot Corp.") is a Tennessee Corporation with its principle place of business in Knoxville, Tennessee.

3.      Defendant, Pilot Travel Centers, LLC, d/b/a Pilot Flying J ("Pilot Flying J"), is a Delaware limited liability company with its principle place of business in Knoxville, Tennessee.

Upon information and belief the members of Pilot Travel Centers, LLC currently include:

a.    Pilot Corporation, a citizen of Tennessee for diversity purposes;

b.    FJ Management, Inc., a citizen of Utah for diversity purposes;

c.    Propeller Corp., a citizen of New York for diversity purposes;

d.    BDT I-A Plum Corp., a citizen of Illinois for diversity purposes;

e.    BDT Plum, LLC, a citizen of Illinois for diversity purposes;

f.    Flying J Real Estate Enterprises, Inc., a citizen of Utah for diversity purposes;

g.    Flying J Franchise, Inc., a citizen of Utah for diversity purposes;

h.    Miguel Loya, a citizen of Texas for diversity purposes;

I.    LS Squared LP, a citizen of Arkansas for diversity purposes;

J.    R. Brad Martin, a citizen of Tennessee for diversity purposes; and,

K.    Enterprise Investment Partners LP, a citizen of Tennessee for diversity purposes.

## JURISDICTION

4.    This Court has subject matter jurisdiction over Plaintiff's claims under: (i) 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs; and the Parties are citizens of different states and/or foreign states (diversity); and (ii) 28 U.S.C. § 1367 (supplemental jurisdiction).

5.    This Court has *in personam* jurisdiction over Defendants pursuant to 28 U.S.C. § 1965(d) and/or 28 U.S.C. § 1965(b).  Moreover, Pilot Flying J operates truck stops within this district and all Defendants have either directed their fraudulent scheme toward or have

communicated with and/or made in-person trips to visit the Plaintiff and others in this district.

6.      At all relevant times, Defendants were found, had agents, directly and/or indirectly conducted business and/or committed a substantial amount of the wrongful actions made the basis of this suit in the Northern District of Alabama.  Accordingly, venue is proper in the Southern Division of the Northern District of Alabama pursuant to 28 U.S.C. § 1391 and 18 U.S.C. § 1965.

<u>STATEMENT OF FACTS</u>

7.      Plaintiff adopts and re-alleges all prior paragraphs of this Complaint as if set forth fully herein.

8.      Pilot Corp. and Pilot Flying J are both headquartered at 5508 Lonas Drive, Knoxville, TN 37909.

9.      Defendant Pilot Flying J owns and operates the country's largest chain of truck stops with hundreds of travel centers nationwide. It is a privately held company with annual revenues of $29 billion dollars. Pilot Flying J is the nation's number one retailer of diesel fuel, and one of the country's largest restaurant operators. Pilot Flying J has thousands of trucking and fleet customers.[1] It is reported to be the sixth largest privately owned company in the United States.

10.     To build and maintain that leading market share, Pilot Flying J, through its national sales team, courts trucking companies such as Plaintiff with offers for discounted diesel fuel. As described in more detail below, those discounted fuel agreements may take the form

---

[1]       Pilot's customers are primarily trucking companies or individual owner/operators of commercial motor vehicles, *e.g.*, long-haul trucks, 18-wheelers, or tractor-trailer rigs.

either of a discount on the invoiced price at the pump, or a monthly rebate on purchases. However, the same salespeople who strike the deals with customers also are able, "and are encouraged by Defendants", with the aid of their Co-Conspirators, to control what discounts or rebates are, in fact, paid to their trucking clientele, such as the Plaintiff. To boost Pilot Flying J's purported profits, to earn themselves higher commissions and/or bonuses, and to pad the profits flowing through to Haslam (the CEO and Chairman of both Pilot Flying J and Pilot Corp.) and Pilot Corp., the Defendants and their Co-Conspirators have systematically shortchanged the Plaintiff and other trucking companies having discount or rebate agreements with Pilot Flying J.

11.     The Defendants' conspiracy to shortchange trucking customers of Pilot Flying J first came to light this spring when the affidavit of a Federal Bureau of Investigation ("FBI") agent participating in a criminal investigation of Pilot Flying J and its affiliates and employees was unsealed. On February 18, 2013, Special Agent Robert Root's affidavit (the "FBI Affidavit") was filed in the U.S. District Court for the Eastern District of Tennessee in support of an application for search warrants related to the Pilot fuel discount and rebate scheme. *See* Ex. A, "FBI Aff."  The FBI Affidavit was filed to demonstrate probable cause that "Pilot employees engaged in a conspiracy and scheme to defraud by deceptively withholding diesel fuel price rebates and discounts from Pilot customers, without the knowledge or approval of the customer, for the dual purposes of increasing the profitability of Pilot and increasing the diesel sales commissions of the Pilot employees participating in the fraud, in violation of 18 U.S.C. §§ 371 (conspiracy), 1341 (mail fraud), 1343 (wire fraud), and 1349 (conspiracy)." (Ex. A at ¶ 93).

12.     Plaintiff adopts and incorporates herein by reference, adopt and alleged the detailed facts set forth in the FBI Affidavit in support of it claims and causes of action.

13.     The FBI Affidavit details systematic cheating of Pilot Flying J customers who purchased diesel fuel for commercial use from Pilot Flying J's fuel stations and travel plazas across the country. The scheme was given the blessing of Haslam and was conducted by, among others, other Pilot Corp. and/or Pilot Flying J executives and employees, who are listed in the FBI Affidavit as having participated in the scheme, but who are not named as defendants herein ("Co-Conspirators").

14.     Defendants described the fuel discount offer as either "cost plus", "cost minus" or "retail minus".

15.     Once the amount of discount was negotiated and agreed upon, the customer would choose whether to receive the benefit of the bargain struck by either a discount or a rebate. The customer would thereafter purchase diesel fuel from various Pilot Flying J locations and pay the retail price of the fuel at the pump.  If the customer chose a discount, the customer would see the discount by way of daily, weekly or monthly fuel statements. These statements reflected the purportedly discounted amount charged to the customer.

16.     These statements would emanate from either a third-party credit company, *i.e.*, a fuel card, the customer would use to purchase the Pilot Flying J fuel, or a statement directly from Pilot Flying J if the customer purchased the Pilot Flying J diesel fuel on credit extended by Pilot Flying J.

17.     If the customer chose a rebate, the customer would pay the retail price for the fuel and thereafter receive a monthly rebate check.  The amount of the rebate check was supposed to be for the difference between the pump price at the time of purchase and the fuel discount the customer had agreed to accept. However, for Plaintiff, Pilot Flying J would, rather than honoring

5

the fuel-rebate deals struck with the customer, unilaterally withhold a portion of the rebate from the customer without the customer's knowledge and consent. The result was a rebate check to the Plaintiff and other Pilot Flying J customers that was less than what the customer should have received or a discount reflected on the fuel statement that was less than what the customer was supposed to receive. Similarly, if the customer entered into a cost-plus, cost-minus or retail-minus discount agreement, the Defendants would manipulate their spreadsheets to provide a lower discount than agreed.

18.     Pilot Flying J systematically and intentionally targeted what it considered to be customers who might not have the manpower or financial sophistication to discover that Pilot Flying J was cheating them. The Defendants' scheme to shortchange Pilot Flying J customers was so pervasive that it became a part of the Pilot culture. Recorded conversations recounted in the FBI Affidavit demonstrate the extent and nature of their efforts to cheat Pilot Flying J customers out of their agreed discounts or rebates.  As described by Pilot Flying J's then Vice President for Sales, John Freeman ("Freeman"), while leading a meeting of Pilot Flying J regional sales directors, the idea of Defendants' ongoing scheme to cheat their trucking customers out of their fuel rebate/discounts was to, "Fuck'em early and fuck'em often...."  *See* Ex. A, at ¶ 63, p. 50.  Freeman directly handled Plaintiff's account(s)

19.     An example of Rebate Fraud directed at Direct Billed Customer occurred during the week of September 24, 2012 when Freeman directed Regional Sales Manager Kevin Clark, in the presence of a F.B.I. Confidential Informant, to change Direct Billed Customer Schrock Trucking's price discount without alerting Schrock Trucking.  Ex. A, at ¶40.

20.     A key aspect of Defendants' scheme was the withholding of information from the

6

Plaintiff and other customers.  As Freeman stated, "They don't have to know our margins, they don't fuckin understand."   Ex. A, p. 79.   This withholding of information included the manipulation of fuel cost.  Freeman even bragged, "I wasn't fuckin' him bad, 'I mean, I wouldn't define fuckin' bad, I mean, I wasn't like beatin' the guy's ass. But it was that three-month stretch in from July, August and September when crude went for $150 to $70 in three months. It wasn't me screwin' him, it was the actual average, the fact that you're lookin' at an average for a month versus day to day." Ex. A, p. 81.

21.     Pilot's Director of Sales for National accounts and Brian Mosher expressed his belief that customers, such as Plaintiff, could not figure out the amount stolen by Defendants without the information withheld by the Defendants:

> If the carrier knows how many gallons they purchased this month in this location, ***and even if we send them daily pricing***, you can't get there from here because you don't know the weighted [average price/volume throughout the month]. You gotta weight it, right? It's not just an aggregate. If you bought 500 gallons in 30 days, unless you bought the exact same amount on each of the 30 days, that's the only way that average holds true.

(Doc. 1, Ex. A at ¶69) (emphasis added).

22.     Kevin Hanscomb, who at all relevant times was Pilot's Director of Sales East Region and, at one time, also handled Plaintiff's account(s), believed in establishing a "personal connection with the customer" to facilitate the fraud and not "over complicating it and gettin' busted."   Ex. A at ¶64.   Hanscomb thought that Pilot could "get away with a little more" in the South Florida area due to the language barrier and that customers were not going to know "oh well, he's screwing us..." Ex. A at ¶82.   The F.B.I. concluded that there was probable cause to believe that Hanscomb also communicated with Regional Sales Director Christopher Andrews regarding the illegal reduction of rebate amounts to customers.  Ex. A at ¶127.   Andrews has

since pled guilty to conspiracy to commit mail and wire fraud in connection with the discount and rebate fraud alleged herein.

23.     Defendants' scheme to cheat Plaintiff and other Pilot Flying J customers out of their full rebates and discounts was conducted with the knowledge and approval of Pilot Corp. and Haslam, and the Co-Conspirators regularly taught this scheme to defraud to all of their sales personnel both in  casual or one-on-one mentoring and in formal sales meetings.

24.     For example, at a November 20, 2012 diesel sales meeting at which Haslam and all regional directors, regional sales managers and regional account representatives were present, Mark Hazelwood ("Hazelwood"), who at all relevant times was the President of Pilot Corp. and Pilot Flying J, joked about introducing a customer "to a guy named Manuel," which was the company nickname for references to "manual" discounts, *i.e.,* manually changing the agreed discounts. Ex. A at ¶ 71.

25.     According to the FBI Affidavit, a confidential informant advised that Haslam and Freeman had been "looking carefully at every Customer's profit and loss report and consolidating duplicate entries," and further that with such information, the "Rebate Fraud would be clearly evident to Jimmy Haslam and John Freeman." Ex. A at ¶ 78.

26.     In a recorded conversation between an FBI Confidential Informant and Freeman, Freeman recounted a conversation with Haslam demonstrating Haslam's knowledge of the fraud:

| | |
|---|---|
| CHS-2: | What does Mark [Hazelwood] and Jimmy [Haslam] say about shit like that? Do they even catch it or do they know? |
| FREEMAN: | Fuckin' A. I mean, I called Jimmy and told him I got busted at Western Express. |
| CHS-2: | What'd he say? |
| FREEMAN: | Oh he knew it. |

| CHS-2: | Oh did he? |
|---|---|
| FREEMAN: | Absolutely. I mean, he knew all along that I was cost-plussin' this guy. He knew it all along. Loved it. We were makin' $450,000 a month on him— |
| CHS-2: | Holy shit! |
| FREEMAN: | -- why wouldn't he love it? |
| CHS-2: | Yeah. |
| FREEMAN: | Did it for five years, cost us a million bucks. I mean, we made $6 millionon the guy, cost us a million bucks. |
| CHS-2: | Great investment. |

Ex. A at ¶ 81.

27.     Haslam and other Co-Conspirators had all the information before them to see the difference between what was being promised to customers versus what they were actually provided. Pilot Flying J and the Co-Conspirators maintained spreadsheets and other records detailing the agreed upon discounts or rebates for each customer, and the amounts Pilot Flying J actually provided to such customers. Accordingly, Defendants and their Co-Conspirators have records specifically identifying the amount the Plaintiff was shortchanged, and the timing of each underpayment.

28.     Although the Pilot insiders had access to spreadsheets and other documents that not only revealed but detailed the fraud, the nature of the Defendants' scheme was difficult for customers without those internal spreadsheets and other documents to detect due to constantly fluctuating diesel fuel prices. To know whether Defendants were manipulating the discounts or rebates owed to them, customers would—at a minimum—have to obtain daily pricing for every truck stop location in the country serving their trucks, then compare those prices to what they were invoiced, and then compare the discounts or rebates they received based on those purchases to the amounts they agreed to accept. Fearing that larger trucking companies with the manpower

9

and software necessary to undertake such an audit might catch onto their fraud, Defendants instead targeted smaller companies and those they arrogantly considered to be "unsophisticated" (Ex. A at ¶¶ 13, 75), a "dumbass" (*id.* at ¶ 66), "dumb shit" (*id.* at ¶ 72), or "lazy" (*id.* at ¶ 68). Defendants also targeted Latinos in the hopes that language barriers might make discovery of their fraud more difficult, or easier to explain away if caught. *Id.* at ¶ 82.

29.     A number of Co-Conspirators have entered guilty pleas to conspiracy to commit mail and wire fraud in connection with the discount and rebate fraud alleged herein, including: Brian Mosher, Director of National Accounts and Director of Sales-Midplains, Arnold Ralenkotter, a regional sales director, Lexie Holden, a regional account representative, Holly Radford, regional account representative, Ashley Judd, a regional account representative, Janet Welch, a regional account representative, Christopher Andrews, a regional sales manager, Kevin Clark, a regional sales manager, Scott Fenwick, a regional sales manager, and Jay Stinnett, an employee.  The FBI's investigation is ongoing.

30.     Plaintiff was a party to fuel rebate and/or discount agreement(s) with Pilot Flying J between approximately 2005 through 2011, under which Pilot Flying J was and is required to credit or refund a certain percentage of Plaintiff's' fuel purchases. The fuel rebate agreements and/or discounts were reached, at times, with Pilot employees Freeman and/or Hanscomb. Hanscomb's home was searched by the FBI pursuant to a search warrant issued based upon the FBI Affidavit. That affidavit further ties Hanscomb to the conspiracy and fraud to cheat Pilot Flying J customers of their discounts and/or rebates. Hanscomb's direct supervisor is Freeman, who was, prior to being promoted, Regional Sales Director of the South/Southeastern Region. Freeman is also tied to the fraud in the FBI Affidavit and his office was searched by the FBI

pursuant to the search warrant.  Plaintiff has, on information and belief, been damaged by the Defendants' herein-described scheme of intentionally, unilaterally and fraudulently reducing and withholding fuel rebates and/or discounts owed to the Plaintiff.

31.     At all relevant times, Pilot Corp., by and through Haslam, and Co-Conspirators, owned, operated, managed and directed Pilot Flying J, and continues to do so. Pilot Corp., through  Haslam and Hazelwood, among other Co-Conspirators, conducted or participated in, directly or indirectly, in the conduct of Pilot Flying J's affairs through a pattern of racketeering activity. Pilot Corp. is engaged in interstate commerce.

32.     Pilot Corp. and Pilot Flying J are both headquartered at, and operated from, the same address—5508 Lonas Drive, Knoxville, TN 37909.  At all relevant times, Pilot Flying J owned and operated (and continues to own and operate) an extensive number of truck stops, travel centers and travel plazas in forty-four states nationwide under the Pilot Flying J brand that were patronized by Plaintiff and other customers in reliance upon the discount and/or rebate agreements with Pilot Flying J. At all relevant times, Pilot Flying J, through Haslam, Pilot Corp. and their Co-Conspirators, engaged in the above-described scheme to fraudulently and intentionally reduce and withhold the fuel rebates and/or discounts owed to Plaintiff and customers, without their knowledge or approval, for the purposes of increasing Pilot Corp. and Pilot Flying J's profitability, increasing Pilot Corp.'s and Haslam's return on investment, and increasing the compensation of Haslam, and their Co-Conspirators. Pilot Flying J is engaged in interstate commerce.

33.     Haslam was (and continues to be) Chairman and CEO of Pilot Corp. and Pilot Flying J. In this position, Haslam exercised control, authority, responsibility and/or supervision

over the Co-Conspirators, Pilot Corp. and Pilot Flying J (and their officers, employees, agents and representatives), including establishing and modeling corporate culture, and approving the operations, policies, procedures, the fuel rebate/discount program and the scheme to defraud Plaintiff and other customers (and continues to do so). Haslam participated or conducted, directly or indirectly, in the conduct of Pilot Flying J's affairs through a pattern of racketeering activity by approving and countenancing the Co-Conspirators' frauds.

34.     At all relevant times, Freeman was Vice President of Sales for Pilot Corp. and Pilot Flying J, and a former Director of Sales for the South/Southeast Regions, and directly supervised the three Regional Sales Directors in the United States, including Arnie Ralenkotter (Northeast), who entered a guilty plea to conspiring to commit wire and mail fraud in connection with the scheme described herein, and Kevin Hanscomb (Southeast), who also handled Plaintiff's account at one time as well as Freeman himself directly handling Plaintiff's account. The FBI Affidavit alleges that Freeman had "for years" engaged in defrauding Pilot's customers out of their agreed-upon fuel rebates/discounts. *See* Ex. A, ¶ 9. Freeman is supervised by Hazelwood. *Id.* Freeman exercised control, authority, responsibility and/or supervision over certain Pilot Corp. and Pilot Flying J employees, agents and representatives, including setting and modeling corporate culture, and approving and implementing operations, policies, procedures, the fuel rebate/discount program and the scheme to defraud Plaintiff and other customers.   Freeman also engaged in and/or caused Pilot Flying J to engage in the above-described scheme to defraud and/or obtain money from Plaintiff through commercial fraud for the purpose of increasing Pilot Flying J's profits and increasing his and other Co-Conspirator or

Defendants' compensation. Freeman thereby conducted or participated in the conduct of Pilot Flying J's affairs through a pattern of racketeering activity.

35.     Other executives and/or employees of Pilot Corp. and/or Pilot Flying J (the "Co-Conspirators"), most, if not all, of whom are named in the FBI Affidavit, participated, directed, conducted and/or conspired with Pilot Corp. to conduct or participate in, directly or indirectly, the conduct of Pilot Flying J's affairs through a pattern of racketeering activity but are not named herein at this time as Defendants.

36.     At all relevant times—since as early as 2005 and continuing indefinitely into the future absent Court intervention—the Defendants have intentionally devised, engaged in, condoned and/or ratified the above-referenced nationwide scheme to defraud and cheat Plaintiff and other customers and/or obtained money from Plaintiff and other customers under false promises (*i.e.*, the unilaterally reduced monthly fuel rebates and/or discounts), thereby damaging Plaintiff and  other customers in their businesses and property. *See* Ex. A.

37.     As set forth in Exhibit A, at all relevant times, Pilot Flying J, acting by and through and under the direction of its members, officers, directors, employees, and/or agents, including Haslam, Co-Conspirators, and Pilot Corp., knowingly, intentionally, and repeatedly engaged in the above-referenced scheme to defraud and cheat Plaintiff and other customers and/or obtained money from Plaintiff and other customers under false promises (*i.e.*, paying unilaterally reduced monthly fuel rebates and/or discounts), without their knowledge or approval, for the purposes of increasing Pilot Flying J's profitability, increasing Haslam and Pilot Corp.'s return on investment, and increasing the Co-Conspirators' compensation (and the compensation of other of Pilot Corp. and/or Pilot Flying J's current and/or former employees).

38.     As set forth in Exhibit A, at all relevant times, Haslam, his Co-Conspirators, along with Pilot Corp., intentionally devised, instigated, engaged in, perpetrated, executed, condoned and/or ratified the above-referenced open-ended and unlawful scheme to defraud and cheat Plaintiff and other customers and/or intentionally engaged in efforts to obtain money from Plaintiff and other customers under false promises, that is, by paying unilaterally reduced monthly fuel rebates and/or discounts, without the knowledge or approval of Plaintiff and other customers, for the purposes of increasing Pilot Flying J's profitability, increasing Haslam and Pilot Corp.'s return on investment, and increasing the Co-Conspirators' compensation (and the compensation of other of Pilot Corp. and/or Pilot Flying J's current and/or former employees).

39.     As set forth in Exhibit A, at all relevant times, Defendants knowingly, intentionally, and repeatedly misrepresented, concealed, hid, and/or caused to be misrepresented, concealed, and hidden, the above-described wrongful acts and practices, and the purposes of their wrongful acts and practices, committed in furtherance of the above-referenced scheme to defraud and cheat Plaintiff and other customers and/or efforts to obtain money from Plaintiff and other customers under false promises (*i.e.*, paying unilaterally reduced monthly fuel rebates and/or discounts).

40.     Co-Conspirators and Pilot Corp. pursued and accomplished this detailed unlawful scheme to defraud by engaging in repeated and systematic mail fraud and/or interstate and/or foreign wire fraud (described in detail in the FBI Affidavit) in violation of 18 U.S.C. §§ 1341, 1343. Specifically, Haslam, his Co-Conspirators and Pilot Corp., individually and/or on behalf of Pilot Flying J (and possibly others), used and/or caused Pilot Flying J (the RICO enterprise) to use the USPS and/or private or commercial interstate carriers and/or interstate and/or foreign

wires in interstate and/or foreign commerce to devise, engage in, condone and/or ratify the above-referenced open-ended and unlawful scheme to defraud and cheat Plaintiff and other customers out of the full amount of their monthly fuel rebates and/or discounts.

41.     At all times materially hereto, Plaintiff was regularly transmitted reports electronically wherein Pilot provided Plaintiff with false information regarding the amount of its fuel rebate and/or discounts.  On June 24, 2011, Freeman not only called Plaintiff's president Clay Halla but also emailed him regarding Plaintiff's account.  In both the telephone call and email, Freeman continued to mislead the Plaintiff into purchasing fuel from Pilot by lying about the handling of Plaintiff's account and promising of rebates, refunds, and/or discounts.  Freeman represented to Plaintiff that Pilot Regional Account Representative Katy Bibee ("Bibee") was going to assist Plaintiff in obtaining the discount/rebates.  Instead, upon information and belief, on June 24, 2011, Freeman electronically directed Bibee to continue defrauding the Plaintiff.  Bibee is also the subject of the FBI Affidavit regarding conversations in which she is complains of customer calls regarding discounts/rebates and that it is the "outside rep's job to know which customers are sophisticated..." regarding the fraud.  Ex. A. at p. 63.

42.     Beginning in approximately March of 2011, Pilot began to conduct daily "sweeps" of money from Plaintiff's account by falsely representing the amount due from Plaintiff regarding fuel purchases vs. amount of discount, refund or rebate due Plaintiff from Pilot.  Those daily false representations were made by Pilot electronically and by telephone.

43.     Although a number of the specific acts of wire and/or mail fraud are detailed in the FBI Affidavit, the dates and substance of all of Defendants' fraudulent communications by and between themselves via the mails and/or interstate and/or foreign wires in furtherance of the

above-referenced scheme to defraud, as well as their fraudulent communications to Plaintiff and other customers in furtherance of their efforts to obtain money from Plaintiff and other customers by false promises via the mails and/or interstate and/or foreign wires, are in Defendants' possession, custody, and control, to the exclusion of Plaintiff and other customers, and await discovery.

44.    The above-referenced wrongful acts violated all concepts of moral uprightness, fundamental honesty, fair play and right dealing in the general and business life of the members of society. The above-referenced wrongful acts unfairly betrayed the confidences Plaintiff and other customers placed in Defendants by and/or through the corruption of Haslam, Pilot Corp. and Co-Conspirators. The above-referenced wrongful acts also were a consistent, regular and dominant part of the corporate culture and manner in which  Haslam, his Co-Conspirators and Pilot Corp. participated in and conducted the day-to-day business affairs of Pilot Flying J (the RICO enterprise).

45.    By their unlawful actions, Haslam, his Co-Conspirators, and Pilot Corp., (i) conducted and/or participated in the affairs of Pilot Flying J (the RICO enterprise) in violation of 18 U.S.C. § 1962(c) and/or (ii) conspired to violate 18 U.S.C. § 1962(c) in violation of 18 U.S.C. § 1962(d), and thereby defrauded and injured the business interests of Plaintiff and other customers in the process.

46.    Haslam, his Co-Conspirators, and Pilot Corp. caused Pilot Flying J (the RICO enterprise) to (i) engage in the fraudulent scheme with the intent, *inter alia*, to defraud and cheat Plaintiff and other customers covertly and unilaterally reducing and withholding the fuel rebates and/or discounts owed to Plaintiff and other customers, and/or (ii) engage in efforts to obtain

money from Plaintiff and other customers by false promises (*i.e.*, paying unilaterally reduced monthly fuel rebates and/or discounts)—all without Plaintiff's and other customers' knowledge or approval, for the purposes of increasing Flying J's profitability, increasing Haslam's and Pilot Corp.'s return on investment, and increasing the Co-Conspirator's compensation—to the financial detriment of Plaintiff and other customers. The above wrongful actions of Haslam, his Co-Conspirators, and Pilot Corp., conducted over the telephone, cell phones and the U.S. mails, constitute repeated mail fraud and/or interstate and/or foreign wire fraud in violation of 18 U.S.C. §§ 1341, 1343.

47.     The above multiple, repeated and continuous acts of mail fraud and/or interstate and/or foreign wire fraud by the Haslam, his Co-Conspirators, and Pilot Corp., constitute a pattern of unlawful racketeering activity pursuant to 18 U.S.C. § 1961(1), (5).

48.     Nothing in the nature of the above-described intentional scheme to defraud and cheat Plaintiff and other customers and/or intentional efforts to obtain money from Plaintiff and other customers by false promises demonstrates that their wrongful actions would ever have terminated but for the United States Government's or court intervention. Moreover, and independent of the duration of the scheme, the wrongful acts of Haslam, his Co-Conspirators, and Pilot Corp. were a consistent, regular and dominant part of the manner in which they conducted and/or participated in the day-to-day business and financial affairs of Pilot Flying J (the RICO enterprise).

## TOLLING OF STATUTES OF LIMITATION

49.     Defendants took active steps to conceal the fact that they wrongfully, improperly, illegally, unilaterally and repeatedly defrauded Plaintiff by reducing and withholding the fuel

rebates and/or discounts owed to them. The details of Defendants' efforts to conceal their above-described unlawful conduct are in their possession, custody and control, to the exclusion of Plaintiff and await further discovery. When this material information was first revealed to Plaintiff after the FBI Affidavit was unsealed by the United States District Court for the Eastern District of Tennessee in Case No. 3:13-MJ-2028 (Dkt. #4), Plaintiff exercised due diligence by investigating the situation, retaining counsel and pursuing its claims. Defendants fraudulently concealed their above-described wrongful acts. Should such be necessary, therefore, all applicable statutes of limitation (if any) are rightfully tolled.

## RESPONDEAT SUPERIOR/AGENCY

50.     Pilot Corp. and Pilot Flying J are liable under the doctrines of *respondeat superior* and/or agency for the above-described wrongful acts committed by the Co-Conspirators and/or their current or former officers, directors, employees, agents, and/or representatives during the course and scope of their employment by, or representation of, Pilot and Pilot Flying J. More specifically, Pilot Corp. and Pilot Flying J are liable because such wrongful acts were committed (i) within their general authority, (ii) in furtherance of their business, and (iii) to accomplish the objective for which such officers, directors, employees, agents, and/or representatives were hired—all of which directly and/or proximately caused (and continue to cause) Plaintiff and other customers to suffer damages to their businesses and/or property to Defendants' financial benefit.

## COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### (AGAINST PILOT CORP.)

51.     The preceding factual statements and allegations are incorporated by reference.

52.     Pilot Flying J is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4)

and1962(c) and, at all relevant times, was engaged in, and the activities of which affected, interstate and/or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4), 1962(c), and 1962(d).

53.      Co-Conspirators and Pilot Corp. are "persons" "employed by or associated with" Pilot Flying J within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

54.      Co-Conspirators and Pilot Corp. conducted and/or participated in the business and financial affairs of Pilot Flying J (the RICO enterprise) through a pattern of unlawful activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5), and 1962(c), that is, the above-described multiple, repeated, and continuous acts of mail fraud and/or interstate and/or foreign wire fraud in violation of 18 U.S.C. §§ 2, 1341, and 1343.

55.      Co-Conspirators and Pilot Corp.'s pattern of unlawful activity and corresponding violations of 18 U.S.C. § 1962(c) directly and/or proximately caused Plaintiff and other customers to suffer injury to their businesses and/or property within the meaning of 18 U.S.C. § 1964(c) in that Plaintiff and other customers were damaged (and will continue to be damaged) by the Co-Conspirators and Pilot Corp.'s (i) reduction and withholding of fuel rebates and/or discounts owed to Plaintiff and other customers, without their knowledge or approval, for the purposes of increasing Pilot Flying J's profitability, increasing Haslam's and Pilot Corp.'s return on investment, and increasing their Co-Conspirators' compensation; and (ii) the lack of earnings and profits Plaintiff and other customers would and should have received on their unilaterally reduced and withheld fuel rebates and/or discounts but for the Haslam's, his Co-Conspirators and Pilot Corp.'s above-described wrongful acts.

56      Co-Conspirators and Pilot Corp. committed these substantive RICO offenses by

19

using Pilot Flying J (the RICO enterprise) to engage in multiple predicate acts of mail fraud and/or interstate and/or foreign wire fraud to defraud and cheat Plaintiff and other customers and/or obtain money from Plaintiff and other customers by false promises by covertly and unilaterally reducing and withholding fuel rebates and/or discounts owed to Plaintiff and other customers, without their knowledge or approval, for the purposes of increasing Pilot Flying J's profitability, increasing Haslam's and Pilot Corp.'s return on investment, and increasing their Co-Conspirators' compensation, all to the financial detriment of Plaintiff and other customers.

57.     Co-Conspirators and Pilot Corp. knew or should have known their above-described tactics, misrepresentations and/or unlawful actions were fraudulent, misleading and illegal and would cause Plaintiff and other customers to suffer damages in the form of, *inter alia*, reduced fuel rebates and/or discounts, business destruction, lost profits, adverse credit effects, and/or lost business opportunities. All of Plaintiff's and other customers' damages were reasonably foreseeable by the Co-Conspirators and Pilot Corp. and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

**COUNT II**
**VIOLATION OF 18 U.S.C. § 1962(d) BY**
**CONSPIRING TO VIOLATE 18 U.S.C. § 1962(c)**
**(AGAINST PILOT CORP.)**

58.     The preceding factual statements and allegations are incorporated by reference.

59.     Pilot Flying J is an "enterprise" within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) and, at all relevant times, was engaged in, and the activities of which affected, interstate and/or foreign commerce within the meaning of 18 U.S.C. §§ 1961(4), 1962(c), and 1962(d).

60.     Co-Conspirators and Pilot Corp. are "persons" "employed by or associated with" Pilot Flying J (the RICO enterprise) within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

61.     Co-Conspirators and Pilot Corp. conspired with each other within the meaning of 18 U.S.C. § 1962(d) to conduct and/or participate in the business and financial affairs of Pilot Flying J (the RICO enterprise) through a pattern of unlawful racketeering activity in violation of 18 U.S.C. §§ 2, 1341, and 1343.

62.     Co-Conspirators' and Pilot Corp.'s conspiracy to conduct or participate in the conduct of the affairs of Pilot Flying J through pattern of unlawful racketeering activity, and their corresponding violations of 18 U.S.C. § 1962(d), directly and/or proximately caused Plaintiff and other customers to suffer injury to their businesses and/or property within the meaning of 18 U.S.C. § 1964(c). Specifically, Plaintiff and other customers were damaged (and will continue to be damaged) by the Defendants' and Co-Conspirators' (i) reduction and withholding of fuel rebates and/or discounts promised and owed to Plaintiff and other customers, without their knowledge or approval, for the purposes of increasing Pilot Flying J's and Haslam's profitability, increasing Pilot Corp.'s return on investment, and increasing Co-Conspirators' compensation, (ii) inducing them to become and remain customers, and (iii) the lack of earnings and profits Plaintiff and other customers should and would have earned on their unilaterally reduced and withheld fuel rebates and/or discounts, but for and proximately and directly Defendants' above-described wrongful acts that constitute predicate acts under 18 U.S.C. § 1961(1) and (5).

63.     The Defendants and their Co-Conspirators committed these substantive RICO offenses by using Pilot Flying J (the RICO enterprise) to engage in multiple predicate acts of mail fraud and/or interstate and/or foreign wire fraud to defraud and cheat Plaintiff and other customers and/or obtain money from Plaintiff and other customers by false promises by covertly

and unilaterally reducing and withholding fuel rebates and/or discounts owed to Plaintiff and other customers, without their knowledge or approval, for the purposes of increasing Pilot Flying J's profitability, increasing Haslam and Pilot Corp.'s return on investment, and increasing the Co-Conspirators' compensation, to the financial detriment of Plaintiff and other customers.

64.     The Defendants and their Co-Conspirators knew their above-described tactics, misrepresentations and/or unlawful actions were fraudulent, misleading, and illegal, and would cause Plaintiff and other customers to suffer damages in the form of, *inter alia*, reduced fuel rebates and/or discounts, business destruction, lost profits, adverse credit effects, and/or lost business opportunities. All of Plaintiff's and other customers' damages were reasonably foreseeable by the Defendants and/or anticipated as a substantial factor and a natural consequence of their pattern of unlawful activity.

## COUNT III
## BREACH OF CONTRACT
## (AGAINST PILOT FLYING J)

65.     The preceding factual statements and allegations are incorporated by reference.

66.     Plaintiff, on the one hand, and Pilot Flying J, on the other hand, mutually intended to form and, in fact, entered into valid and enforceable fuel rebate and/or discount contract(s) under which Pilot Flying J was required to credit or refund a certain percentage of Plaintiff's and other customers' fuel purchases in the form of rebates and discounts on a regular basis.

67.     All conditions precedent to Pilot Flying J's liability under these contract(s) were performed by Plaintiff and other customers. Plaintiff and other customers performed all of their obligations under the contract(s) by, *inter alia*, patronizing Pilot Flying J truck stops, purchasing fuel and/or purchasing other goods and services.

68.     Pilot Flying J, however, breached its contract(s) with Plaintiff and other customers by knowingly, maliciously, fraudulently, willfully, wantonly, unilaterally, negligently and/or wrongfully reducing and withholding Plaintiff's and other customers' monthly fuel rebates and/or discounts as required under the terms of their contract(s) with the Plaintiff and other customers.  Pilot Flying J's wrongful actions constitute breach of contract at common law.

69.     Pilot Flying J's above wrongful actions directly and/or proximately caused Plaintiff and other customers to suffer damages in the form of, *inter alia*, reduced fuel rebates and/or discounts, business destruction, lost profits, adverse credit effects and/or lost business opportunities.

### COUNT IV
### DECEPTIVE TRADE PRACTICES
### (AGAINST ALL DEFENDANTS)

70.     The preceding factual statements and allegations are incorporated by reference.

71.     Defendants engaged in unconscionable, false, and deceptive acts or trade practices by engaging in the Fuel Rebate Fraud scheme as alleged herein. Defendants' conduct in instituting the Fuel Rebate Fraud scheme constitutes a deceptive trade practice in violation of the Tennessee Consumer Protection Act of 1977.

72.     Plaintiff is a person as defined under Tennessee Code §47-18-103(9).

73.     Defendants misled and deceived Plaintiff and other customers by reducing diesel fuel rebates and discounts without their knowledge or consent. Defendants' profited from rebate funds and discounts wrongfully withheld from Plaintiff and other customers.

74.     Defendants actions violate Tennessee Code §47-18-104, in that their conduct consists of unfair or deceptive acts or practices affecting the conduct of trade or commerce.

75.     Defendants knowingly engaged in the deceptive practices, which constitute unfair and deceptive conduct in trade or commerce.

76.     Plaintiff and other customers throughout the United States have been damaged as a proximate result of the conduct complained of herein.

77.     As a direct and proximate result of the Defendants' deceptive trade practices, Plaintiff has suffered actual damages in an amount to be proven at trial.

78.     Defendants' conduct complained of herein renders it liable for damages for the consequences of such conduct.

79.     Defendants' actions were willful, wanton, malicious, and in total disregard for the rights of Plaintiff and other customers.  Defendants knew or should have known, in light of the surrounding circumstances that their conduct in violation of Tennessee's Consumer Protection Act would naturally and probably result in damages to Plaintiff and other customers.  Defendants continued their wrongful conduct with malice or in reckless disregard of the consequences, from which malice may be inferred. Further, Defendants intentionally pursued their course of conduct for the purpose of causing Plaintiff and other customers damages. Punitive damages should be awarded to deter the actions of Defendants and others who might engage in similar action or conduct.

80.     Plaintiff is also entitled to all any and all penalties and/or multipliers of damages as may be provided under Tennessee's Consumer Protection Act, or otherwise, including injunctive relief, monetary, treble damages, and punitive damages, as well as reasonable attorneys' fees, costs of this action, plus judgment interest and post judgement interest.

24

**COUNT V**
**UNJUST ENRICHMENT**
**(AGAINST ALL DEFENDANTS)**

81.     The preceding factual statements and allegations are incorporated by reference. With respect to Pilot Flying J only, this count is brought in the alternative to Count III.

82.     Defendants have been (and continue to be) unjustly enriched by, *inter alia*, (i) the above-described unlawfully reduced and withheld fuel rebates and/or discounts; (ii) using and/or investing the fraudulently obtained revenues in connection with other enterprises; and (iii) generating a return on the amounts described in (i) and (ii). Accordingly, Plaintiff seeks to impose a constructive trust over (and recover) all amounts by which Defendants (and other persons, including Defendants' current and/or former employees identified in this complaint and/or Exhibit A and possibly others, the identities of whom are known only to Defendants at this time) have been (and continue to be) unjustly enriched.

**COUNT VI**
**FRAUDULENT MISREPRESENTATION**
**(AGAINST ALL DEFENDANTS)**

83.     The preceding factual statements and allegations are incorporated by reference.

84.     As set out in detail in the preceding paragraphs, Defendants made misrepresentations to the Plaintiff and other customers.

85.     These representations concerned material facts.

86.     These representations were false.

87.     Defendants' knew these representations were false when they were made to the Plaintiff and other customers.

88.     Defendants wantonly, willfully, recklessly, oppressively, outrageously, and/or

intentionally made the above-described representations to the Plaintiff and other customers without regard for the truthfulness or falsity of the representations.

89.     Defendants made these representations with the intention that the Plaintiff and other customers would rely on them.

90.     Plaintiff and other customers reasonably relied on these representations to their detriment.

91.     Plaintiff and other customers were damaged as a direct and proximate result of Defendants' misrepresentations.

## COUNT VII
## NEGLIGENT MISREPRESENTATION
## (AGAINST ALL DEFENDANTS)

92.     The preceding factual statements and allegations are incorporated by reference.

93.     As set out in detail in the preceding paragraphs, Defendants made misrepresentations to the Plaintiff and other customers.

94.     These representations concerned material facts.

95.     These representations were false.

96.     Defendants' knew or negligently disregarded the fact that these representations were false when they were made to the Plaintiff and other customers.

97.     Defendants made these representations with the intention that the Plaintiff and other customers would rely on them.

98.     Plaintiff and other customers reasonably relied on these representations to their detriment.

99.     Plaintiff and other customers were damaged as a direct and proximate result of

26

Defendants' misrepresentations.

## COUNT VIII
## SUPPRESSION
## (AGAINST ALL DEFENDANTS)

100.    The preceding factual statements and allegations are incorporated by reference.

101.    Defendants had a duty to disclose and pay to Plaintiff and other customers the proper amount of fuel rebates and/or discounts that they were actually owed pursuant to their fuel rebate and/or discount agreements.

102.    Defendants uniformly, wantonly, willfully, recklessly, oppressively, outrageously, and/or intentionally and concealed their intention to withhold, and acts of withholding, the fuel rebates and/or discounts owed to Plaintiff and other customers, without their knowledge or approval, for  the purposes of increasing Pilot's profitability, increasing the Defendants' return on investment, and increasing the Pilot Executives' compensation (including Defendants' current and/or former employees)—to the financial  detriment of Plaintiff and other customers.

103.    Defendants' concealment and suppression of their payment of less monies to Plaintiff and other customers than they were owed caused the Plaintiff and other customers to continue to do business with the Defendants, not realizing the Defendants were not living up to their promises.

104.    The Plaintiff and other customers were damaged as a direct and proximate result of the Defendants' intentional, reckless and/or negligent suppression.

## COUNT IX
## CONVERSION
## (AGAINST ALL DEFENDANTS)

105.    The preceding factual statements and allegations are incorporated by reference.

106.    Defendants wrongfully, illegally and intentionally converted for its own use and benefit Plaintiff's refunds, rebates and/or discounts, as well as monies directly from Plaintiff's accounts through daily "sweeping".

107.    The Plaintiff was damaged as a direct and proximate result of the Defendants' actions and Plaintiff is entitled to the return of those refunds, rebates, discounts and/or monies, as well as the additional relief requested in this action.

## RELIEF REQUESTED

**WHEREFOR,** Plaintiff respectfully requests that:

1) With respect to Counts I–II (violations of RICO, 18 U.S.C. § 1961, *et seq.*):

   i)  threefold the actual, consequential and/or incidental damages sustained by Plaintiff along with costs of suit, attorneys' fees, litigation expenses, and court costs, all pursuant to 18 U.S.C. § 1964(c), together with pre- and post-judgment interest at the highest legal rates;

   ii) equitable relief, as may be appropriate, pursuant to 18 U.S.C. § 1964(a), including an equitable accounting for all benefits, consideration, and gross revenues received, directly or indirectly, including the imposition of a constructive trust, the voiding of unlawful transfers, the disgorgement of all ill-gotten gross revenues and/or all amounts by which Defendants have been unjustly enriched; and,

   iii) injunctive relief;

2) With respect to Counts III–IX:

   i)   actual, consequential and/or incidental damages to be determined by the trier of fact;

   ii)  punitive damages;

   iii) all amounts by which Defendants have been unjustly enriched and/or converted by Defendants;

   iv)  an equitable accounting for all benefits, consideration, and gross revenues received, directly or indirectly, by any of the Defendants, including the

28

imposition of a constructive trust, the voiding of unlawful transfers, and the disgorgement of all ill-gotten gross revenues;

v)     injunctive relief (as set forth above);

vi)    pre- and post-judgment interest at the highest legal rates; and,

vii)   attorneys' fees and litigation expenses incurred through the trial and any appeals of this case; costs of suit;

3) For all Counts, such other and further relief that the Court deems just and proper.

**JURY DEMAND**

Plaintiff respectfully demands a trial by struck jury on all claims so triable.

Dated May 22, 2014.                                              Respectfully Submitted,


                                                     _/s/Stephen M. Tunstall_____
                                                     **Stephen M. Tunstall (TUNSS4180)**


**OF COUNSEL:**

**STEPHEN M. TUNSTALL, P.C.**
Post Office Box 152
Mobile, Alabama 36601
Tel: (251) 432-2221
Fax: (251)432-2218
stephentunstall@yahoo.com


                                                     /s/ M. Rebecca Hill_____
                                                     **Stuart M. Maples (MAP004)**
                                                     **M. Rebecca Hill (HIL061)**


**OF COUNSEL:**

**MAPLES LAW FIRM, P.C.**
401 Holmes Avenue, Suite H
Huntsville, Alabama 35801
(256) 489-9779
smaples@maples-law.com

                                                     **Attorneys for Plaintiff**

29

**PLEASE SERVE DEFENDANTS BY CERTIFIED MAIL AS FOLLOWS:**

      PILOT TRAVEL CENTERS, LLC,
      d/b/a PILOT FLYING J
      c/o C T CORPORATION SYSTEM
      2 NORTH JACKSON STREET, SUITE 605
      MONTGOMERY, ALABAMA 36104

      PILOT CORPORATION
      c/o C T CORPORATION SYSTEM
      2 NORTH JACKSON STREET, SUITE 605
      MONTGOMERY, ALABAMA 36104